**GREAT ATLANTIC & PACIFIC TEA CO. v. PORTER, Price Adm'r.**

No. 282.

United States Emergency Court of Appeals.
Heard at New York City March 27, 1946.

Decided Aug. 13, 1946.

Richard A. Tilden, of Washington, D. C. (Sumner S. Kittelle, of New York City, on the brief), for complainant.

John O. Honnold, Jr., Chief, Court Review Price Branch, of Washington, D. C. (Richard H. Field, General Counsel, and Jacob D. Hyman, Associate General Counsel, and Betty L. Brown, Atty., all of Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LINDLEY, Judges.

MAGRUDER, Judge.

On this complaint, which challenges the validity of Amendment No. 12 to Revised Price Schedule No. 50, the only question to be decided is whether the Price Administrator has statutory authority, in order to reduce inflationary pressures on domestic price ceilings for green coffee, to forbid the importation into the United States of green coffee purchased abroad at a price above a prescribed maximum. Our answer is in the affirmative.

Price control for coffee was first imposed, under authority of Executive Order, by Price Schedule No. 50—Green Coffee, issued on December 11, 1941 (6 F.R. 6373). The schedule became effective under the later enacted Emergency Price Control Act pursuant to § 206 thereof, 56 Stat. 35, 50 U.S.C.A.Appendix, § 926, and was republished in the Federal Register on February 21, 1942, as Revised Price Schedule No. 50 (7 F.R. 1305). The price schedule established specified dollars-and-cents maximum prices for various types of green coffee at all levels of distribution. It also prescribed what were in effect maximum

buying prices for importers. Section 1(a) provided: "No person shall buy, offer to buy, attempt to buy, import or receive, in the course of trade or business, green coffee at prices higher than the maximum prices established in this schedule".[1]

The reasons for this type of regulatory provision are fairly obvious. The Administrator has no power to impose legal maximum prices upon foreign producers for sales consummated abroad. But in protection of the schedule of domestic maximum prices for imported commodities, it is appropriate for the Administrator, so far as is possible within his delegated powers, to require importers to buy the commodities abroad at prices consistent with the established maximum prices for resales within this country. If American importers were free to purchase green coffee abroad at uncontrolled prices, the tendency would be for the limited supplies to be secured by importers able to absorb losses or willing to resell at black market levels. Large importer-roasters, who derive their profit from the sale of roasted coffee at wholesale or retail, would have an advantage buying in the world market in competition with importers who customarily sell green coffee to independent roasters, with possible disruption of the equitable distribution of the commodity.

We have set forth above the provision of § 1(a) in its earlier form. By Amendment No. 12, issued October 18, 1945 (10 F.R. 12992), the language of the provision was amplified to read as follows: "No person shall by direct or indirect methods, buy, offer to buy, attempt to buy, import or receive, green coffee in the course of trade or business, individually or through any agent, or through a foreign or a domestic corporation or any foreign or domestic subsidiary thereof partly or solely owned or controlled by such person, at prices higher than the maximum prices established in this schedule".

In his Statement of Considerations issued along with Amendment No. 12, the Administrator explained the purpose of the amendment as follows:

"This amendment has been necessary in order to prohibit effectively the purchase by importer-roasters of green coffee in producing countries at prices higher than those established in the Schedule. While the manifest intention has been to prohibit any person from buying, offering to buy, attempting to buy, import or receive in the course of trade or business, green coffee at prices higher than the maximum prices established in the Schedule, buyers have construed Section 1351.1(a) in such a manner as to permit the use of an agent or subsidiary corporation in foreign countries to pay excess prices and to then effectuate a resale to the importer-roaster at the ceiling prices established in the Schedule.

"This practice has been considered, by interpretation, an evasion of the Schedule. Consequently, in order that there be no doubt as to the positive prohibition of this means to evade the established ceiling prices, the amendment clarifies the applicable section so that the prohibition against buying at above the established maximum prices shall extend to any person either acting individually or through an agent or through a foreign or domestic corporation or foreign or domestic subsidiary thereof wherever located."

The device in § 1(a) of RPS 50 of imposing maximum buying prices upon importers has been utilized by the Administrator in a large number of regulations establishing maximum prices for imported commodities, and is regarded by him as a vital part of the control mechanisms for such commodities.

In the case of commodities like green coffee, where the position of American importers in the world market is a dominant one, it is not unreasonable to anticipate that the device in question would have an important restraining influence upon the selling prices of foreign producers; and, in the judgment of the Administrator, such has been the experience.

---

[1] The quotation is from § 1 (a) as amended by Amendment No. 6 issued December 15, 1943 (8 F.R. 12687). However, the substance of this provision was in the price schedule from the outset.

Of course, if the level of prices in the regulation were set too low, the device would not work in the face of concerted and long-continued refusal of foreign producers to sell at the specified prices, and the commodity would disappear from the American market. Such a situation, if it arose, could be alleviated by appropriate increases in the established maximum prices, or by the payment of subsidies to importers, with permission to them to pay an additional amount, corresponding to the subsidy, to foreign producers of the commodity. In fact, in the case of green coffee, resort has been had to a subsidy. By Directive No. 87 of the Office of Economic Stabilization, issued November 23, 1945 (10 F.R. 14450), the Reconstruction Finance Corporation was directed to pay to importers a subsidy of three cents per pound for green coffee purchased and shipped between November 19, 1945, and March 31, 1946, within the limits of quotas established for each importer; and the Price Administrator was directed to authorize a corresponding increase in importers' maximum buying prices established by RPS 50.[2] By further directive, the period of the subsidy was extended (11 F.R. 2994).

Complainant, a New Jersey corporation, is an operating subsidiary of The Great Atlantic & Pacific Tea Company of America, a Maryland corporation. It operates a chain of retail grocery stores in various states. Also, it owns a number of coffee roasting plants located in various parts of the United States. At these plants complainant roasts imported green coffee purchased by it in South America. The roasted coffee is then sold through complainant's retail outlets. For many years antedating price control, complainant has purchased its coffee from American Coffee Corporation, a New Jersey corporation, also a wholly owned subsidiary of The Great Atlantic & Pacific Tea Company of America. The business of American Coffee Corporation consists in purchasing green coffee in various South American countries and selling the same in South America to complainant and others. After the institution of price control, complainant con-

tinued to acquire its green coffee through American Coffee Corporation, which bought the same from Brazilian and other producers at prices often in excess of the maximum prices established in RPS 50, but took care to resell to complainant at prices not in excess thereof. By this method of operation, complainant regarded itself as technically not in violation of § 1(a) in its earlier form.

It was to put a stop to such and similar practices, which the Administrator regarded as evasive, that Amendment No. 12 was issued.

On October 29, 1945, complainant filed its protest against Amendment No. 12. The protest was denied by order issued November 28, 1945, after which the present complaint was filed in this court. Thereafter we granted an application by complainant for leave to introduce additional evidence. The protest proceedings were reopened for the reception of this evidence and further evidence which the Administrator deemed it proper to incorporate. By Supplemental Opinion issued February 14, 1946, the Administrator reviewed the additional evidence and adhered to his earlier orders denying the protest.

In its protest, complainant made several objections to the validity of Amendment No. 12. Before us, the issues have been narrowed, as precisely stated in the complaint, in the following terms:

"Complainant's principal objection to RPS 50 and to Amendment 12 thereto, asserted in said protest, which objection raised the sole issue relied upon by Complainant in support of this complaint, and the facts relied upon in support of such objection, are as follows:

"(1) The prohibition against the purchase, offer to purchase, attempt to purchase, importation or receipt of green coffee by the Complainant either directly or through its affiliate, the American Coffee Corporation, at prices higher than the maximum prices established in RPS 50, exceeds the jurisdiction of Respondent, when it is applied to purchases, offers to purchase, attempts to purchase, etc., con-

---

[2] Amendment No. 13 to RPS 50, issued November 28, 1945 (10 F.R. 14605), made the change required by this Directive.

summated wholly outside of the United States, its territories and possessions, and the District of Columbia.

"(2) The authority under which Respondent issued RPS 50 and Amendment 12 thereto, is contained in the Emergency Price Control Act of 1942, as amended [50 U.S.C.A.Appendix, § 901 et seq.].

"Section 1(c) of such Act provides as follows: 'The provisions of this Act shall be applicable to the United States, its territories and possessions, and the District of Columbia.'

"From this provision it is clear that the Congress intended to limit the authority of Respondent to the issuance of price regulations affecting sales and deliveries in the United States, its territories and possessions, and the District of Columbia.

"(3) The action of Respondent in attempting to control the prices at which green coffee may be purchased in foreign countries is beyond the scope of the authority granted to the Respondent by the Emergency Price Control Act, as amended."

Complainant concedes in its brief that limitation upon the price importers may pay in South America for green coffee might be an appropriate measure to relieve pressures on domestic price ceilings, but rests on the legal proposition that Congress has not granted authority to the Administrator to impose such a limitation.

It seems to us that complainant's argument rests too heavily upon § 1(c) of the Act, which states that its provisions "shall be applicable to the United States, its Territories and possessions, and the District of Columbia." So far as there is any indication in a rather meager legislative history of § 1(c), it appears that all Congress had in mind was to make clear that price control was to operate not only throughout continental United States but also within its outlying territories and possessions. Hearings before Senate Committee on Banking and Currency on H.R. 5990, 77th Cong., 1st Sess., p. 160. § 1(a) of RPS 50 may reasonably be deemed necessary and appropriate to prevent circumvention of the prescribed maximum prices for sales of coffee within the United States and to assure an equitable distribution of the commodity, and falls within the broad discretion conferred upon the Administrator by §§ 2(d) and 2(g) of the Act.

The Administrator has no extraterritorial power to make illegal the sales of green coffee in South America at prices in excess of maxima established by him. But § 1(a) of RPS 50 is not invalid as an attempt to do by indirection what cannot be done directly, as complainant contends. Section 1(a) leaves the foreign producer legally free to sell green coffee abroad at whatever price he pleases. As interpreted by the Administrator, § 1(a) does not even forbid the purchase abroad of green coffee at prices in excess of the ceilings.[3] What is forbidden is an act clearly within the territorial jurisdiction of the Administrator, namely, the act of importing into the United States green coffee which has been bought abroad at prices inconsistent with the effective maintenance of the established scale of maximum prices for domestic sales of the commodity.

Complainant makes much of the concession in the Administrator's brief that "the prohibitions based on the act of importing and receiving coffee in this country are in fact intended to control the price paid for that coffee, even though the purchase may be accomplished outside the country." The control referred to is an economic effect upon the foreign market which may be greater or less depending upon the extent to which purchases by American importers dominate the foreign market. But in the nature of things, price control of domestic sales of imported commodities tends to have an economic effect upon the foreign market, for, generally

---

[3] The provision of § 1(a) that no person shall "buy" coffee at prices higher than those prescribed in the price schedule has been construed as applicable to the purely domestic sales and purchases governed by the price schedule, and not as applicable to foreign purchases apart from importation and receipt of green coffee in the United States.

speaking, importers will not buy abroad at prices which do not admit of profitable resale within the United States. Exercise by the Administrator of a granted power to prohibit an inflationary or disruptive practice—importation of a commodity bought at a price out of line with the established prices for domestic sales—is not rendered invalid by the fact that the prohibition may, or indeed is intended to, produce economic consequences outside the area of the granted power. United States v. Darby, 1941, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430. Cf. Gemsco, Inc., v. Walling, 1945, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921.

If, as we hold, the provision of § 1 (a) of RPS 50 in its earlier form was valid, it necessarily follows that Amendment No. 12 is valid. All that amendment did was to make clear that the intended prohibition in § 1(a) should not be evaded by the utilization of a corporate subsidiary or affiliate. See Great Northern Co-op. Assn. v. Bowles, Em.App., 1944, 146 F.2d 269.

A judgment will be entered dismissing the complaint.