## MORA v. MEJIAS.
### No. 4752.

United States Court of Appeals,
First Circuit.
July 24, 1953.

James R. Beverley and Francisco Castro Amy, San Juan, Puerto Rico (R. Castro-Fernandez, San Juan, Puerto Rico, on the brief), for appellants.

Jose Trias Monge, Atty. Gen., San Juan, Puerto Rico (Abe Fortas, Sp. Asst. Atty. Gen., and Arnold, Fortas & Porter, Washington, D. C., on the brief), for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

This is an appeal under 28 U.S.C. § 1292 (1) from an interlocutory judgment in the United States District Court for the District of Puerto Rico, entered June 19, 1953, denying an application for a temporary injunction against the Secretary of Agriculture and Commerce of Puerto Rico enjoining him from enforcing or instituting any proceedings to compel compliance with his Administrative Order No. 228 of March 12, 1953, fixing the maximum prices for the sale of rice in Puerto Rico, and from interfering in any manner with the sale of rice by any one of the plaintiffs, pending final judgment in the case.

The complaint below was filed June 4, 1953, by plaintiff Enrique Mora, Jr., an importer of rice in Puerto Rico, and was stated to be brought "on behalf of himself and all other importers of rice in Puerto Rico similarly situated." Jurisdiction of the complaint in the court below was founded upon 28 U.S.C. § 1331.

Administrative Order No. 228 was a local price regulation of general applicability in Puerto Rico issued under authority of Law No. 228 enacted by the legislature of Puerto Rico on May 12, 1942 (Laws P.R.1942, p. 1268). That act was modeled closely upon the Emergency Price Control Act of 1942, 56 Stat. 23, 50 U.S.C.A.Appendix, § 901 et seq. It authorized the designated administrator, whenever in his judgment the price or prices of staple commodities had risen or threatened to rise in a manner inconsistent with the purposes of the act, to establish by regulation or order "such maximum prices or maximum profits as in his judgment are generally fair and equitable and will effectuate the purposes of this Act." As foundation for obtaining judicial review, it was provided in § 11 that within ten days following the promulgation of any price regulation or order, any person directly subject to the provisions thereof might, in accordance with regulations prescribed by the administrator, file an application for reconsideration, setting forth his objections to any such provisions. Section 12 provided that any person aggrieved by the dismissal, in whole or in part, of his application for reconsideration, might, within ten days thereafter, file a petition with "the Supplies Appeal Court hereinafter created", setting forth his objections and praying that the regulation or order be revoked in whole or in part. That court was given exclusive jurisdiction, upon the filing of such petition, to revoke such regulation or order, in whole or in part, or to dismiss the petition, or to remand the proceedings.[1] Section 12(b) provided that no regulation or order shall be revoked in whole or in part unless the petitioner shows and establishes to the satisfaction of the court, that the regulation or order "is con-

1. In place of the Supplies Appeal Court, the initial reviewing court is now the Superior Court, under § 13(a)1 of the Judiciary Act of July 24, 1952.

trary to law, or is arbitrary or capricious." It was provided in § 12(c) that the Supplies Appeal Court "shall not have power to issue temporary injunction or an interlocutory order suspending or restricting in whole or in part the effectiveness" of any such price regulation or order. Within ten days after the entry of judgment by the Supplies Appeal Court, a petition for a writ of certiorari might be filed in the Supreme Court of Puerto Rico, as prescribed in § 12(d) of the act. That subsection further provided that the Supplies Appeal Court, and the Supreme Court of Puerto Rico, when reviewing judgments and orders of the General Supplies Administrator, shall have exclusive jurisdiction to determine the validity of any price regulation or order; and that except as provided in § 12, no court shall have jurisdiction or power to consider the validity of any such regulation or order or to suspend, restrain, or prevent by injunction, or revoke or annul, in whole or in part, any provision of the act authorizing the promulgation of such regulations or orders, or to prevent the effectiveness of any provision of any such regulations or orders, or to issue a writ of injunction to restrain the effectiveness and application of any such provision. Section 13 contained provisions for enforcement, both by way of criminal prosecution and by way of injunction at the suit of the administrator.

Prior to the promulgation of Administrative Order No. 228 pursuant to the aforesaid insular statute, the prices of rice at all levels of distribution, including the prices of millers or suppliers in continental United States, and wholesale and retail prices in Puerto Rico, were controlled by regulations of the Director of Price Stabilization under the Defense Production Act of 1950, 64 Stat. 798, as amended, 50 U.S.C.A.Appendix, § 2061 et seq. The last prices established by the OPS for sales of rice by millers in continental United States were $12 per cwt. for rices of superior quality, which is 15% or less broken, and $11.60 per cwt. for rices of good quality, classified as choice or medium, which is more than 15% and less than 40% broken. The regulation of the OPS establishing

wholesale prices in Puerto Rico was predicated upon the established maximum prices for milled rice in continental United States, plus freight and insurance and a percentage mark-up to allow a reasonable profit to the importer. Under this formula, the last authorized OPS prices at wholesale in Puerto Rico amounted to $12.90 per cwt. for rices of superior quality, as defined, and $12.25 for choice or medium rices, less than 40% broken. These prices, we are told, were at the highest levels in history.

Shortly before Administrative Order No. 228 went into effect, all federal price controls on rice were lifted by the Office of Price Stabilization. That posed a serious threat to the economy of Puerto Rico.

The production of rice in Puerto Rico is negligible, and over 3,000,000 cwt. bags of rice are imported into the island annually. Over 90% of the rice imported into Puerto Rico is produced in continental United States. The greater part of these importations from continental United States comes from California, but heavy importations are also derived from Arkansas, Texas, Louisiana, and Mississippi. Such volume of importation into Puerto Rico from continental United States represents a very substantial percentage of the total quantity of milled rice sold by domestic millers for consumption outside the United States. See Statement of Considerations to Amendment 2 to Ceiling Price Regulation 12 (17 F.R. 6084). Rice is the most important item in the diet of the Puerto Rican people. Per-capita consumption of rice in Puerto Rico amounted to 146 lbs. during 1952–1953, as compared to 6 lbs. in continental United States. Even an increase of one cent per pound in the retail price would inflict serious hardship, especially upon the low-income groups, who comprise the greater part of the population.

To fill the price control void left by the removal of federal controls, the local administrator issued Administrative Order No. 228, in question, on March 12, 1953, to be effective March 16, 1953, setting maximum prices for the sale of rice of all grades in Puerto Rico. Such maximum prices were fixed in dollars and cents, rather than in terms of an established percentage mark-

up over cost. Thus, the wholesale price per cwt. for rices of superior quality was fixed at $12.90, and the wholesale price for rices of choice or medium grade, less than 40% broken, was fixed at $12.25. These wholesale prices were the same, or substantially the same, as the wholesale prices which importers had been permitted to charge under the superseded OPS federal regulation. Plaintiff says that these prices were all right while the importers' costs were held down by federal regulation of millers' prices in continental United States, but that such prices have become oppressive and confiscatory now that the importers have to buy in an unregulated market, where the prices are beyond the control either of the importers or of the local price administrator in Puerto Rico.

It appears that the plaintiff, and other importers of rice, duly filed an application with the administrator for reconsideration of Administrative Order No. 228; that the administrator gave the importers a hearing on the application on April 27, 1953, at which hearing a motion was made for the issuance of an order of supersedeas or suspension of the price regulation until final determination of its validity; that on May 29 the administrator denied said motion for reconsideration and declined to grant the supersedeas requested; that on the same date a petition for review of the administrative action was filed in the Superior Court of Puerto Rico pursuant to § 12 of the Act,[2] and that said proceeding was pending in the Superior Court at the time of the hearing below on the application for a temporary injunction. We were informed at the oral argument of the present appeal that the Superior Court has meanwhile heard the petition for review and is awaiting the submission of briefs therein.

In the case now before us, the court below (Hon. Benjamin Ortiz, Acting U. S. District Judge) found as a fact, upon evidence submitted on behalf of the plaintiff, that in August, September and October, 1952, while federal price controls were still in effect, plaintiff executed several contracts for the purchase of a total of 6400 bags of rice, of 100 lbs. each, from several rice growers in California; that under those contracts deliveries were to be made through semi-monthly shipments to Puerto Rico, beginning in January, 1953, through August, 1953; that no fixed purchase price was set in any of these contracts, all of which called for an "open price", that is, a price to be measured by the market price prevailing in continental United States at time of each shipment, plus any increase in freight or insurance, C.I.F. San Juan. The district judge further found that at the time Administrative Order No. 228 became effective, on March 16, 1953, plaintiff had actually received in Puerto Rico 1400 bags of rice under the aforesaid contracts; that 1000 of these bags were of superior quality rice, purchased by plaintiff at a price of $13.25 (market price in California at date of shipment), the remaining 400 bags being of 39% rice purchased at a price of $12.45; that on March 16, 1953, plaintiff had in stock in Puerto Rico all of said 1400 bags of rice; that after the effective date of Administrative Order No. 228 "plaintiff was and is to receive 5000 more bags of rice, under the contracts referred to, last shipment to be made on the second half of August." The district judge found also, that as to each of the aforesaid 1400 bags of rice actually imported by plaintiff into Puerto Rico at the time the challenged order became effective, if plaintiff were to sell said rice at the prices fixed in the order "he would lose 50 cents on each bag and he would also lose the opportunity of making a profit of 84 cents per bag on 15% superior quality rice and 73 cents per bag on 40% rice." There was also evidence tending to show that plaintiff, prior to the date of the hearing below, had received some further shipments of rice under the aforesaid contracts, purchased at similar high prices in California, but plaintiff's testimony along this line was somewhat confusing, and the district judge made no further findings on this matter. He did find, however, that rice is a perishable commodity, and that in Puerto Rico there is a

2. See footnote 1 supra.

maximum limit of three months within which rice may be conserved without deterioration.

The district court ruled that it had jurisdiction of the complaint, as stating a civil action arising under the Constitution of the United States within the meaning of 28 U.S.C. § 1331. The complaint alleged that the application to plaintiff and other rice importers of the wholesale prices established in Administrative Order No. 228 would deprive them of their property without due process of law, in violation of the Fifth Amendment of the federal Constitution; or, if not the Fifth, then the Fourteenth Amendment. It was claimed that plaintiff had no adequate remedy under the laws of Puerto Rico; and that plaintiff stood to suffer irreparable damage unless the federal court granted relief by way of a temporary and a permanent injunction, as prayed in the complaint.

■ No doubt under the Organic Act of 1917, 39 Stat. 951, the insular government was subject to the due process clause of the Fifth Amendment. See Balzac v. People of Porto Rico, 1922, 258 U.S. 298, 312–313, 42 S.Ct. 343, 66 L.Ed. 627. Under the terms of the "compact" offered to the people of Puerto Rico by Pub.L. 600, 64 Stat. 319, 48 U.S.C.A. §§ 731b–731d, and by the Joint Resolution of Congress approving the Constitution adopted by the people of Puerto Rico pursuant thereto, 66 Stat. 327, 48 U.S.C.A. § 731d note, the government of the newly created Commonwealth of Puerto Rico is subject to "the applicable provisions of the constitution of the United States". That must mean that the people of Puerto Rico, who remain United States citizens, are entitled to invoke against the Commonwealth of Puerto Rico the protection of the fundamental guaranty of due process of law, as provided in the federal Constitution. For our present purposes it is unnecessary to determine whether it is the due process clause of the Fifth Amendment or that of the Fourteenth Amendment which is now applicable; the important point is that there cannot exist under the American flag any governmental authority untrammeled by the requirements of due process of law

as guaranteed by the Constitution of the United States. It is true, the Constitution of the Commonwealth of Puerto Rico contains a due process clause, which will be authoritatively interpreted and applied by the Supreme Court of Puerto Rico as a matter of local law. But the overriding federal constitutional guaranty of due process of law may be vindicated in the federal courts, and ultimately of course by the Supreme Court of the United States. The terms of the compact, under which the Commonwealth government was established, did not disturb the jurisdiction of the federal courts, as provided in the Judicial Code, Title 28 U.S.C. We agree that the court below had jurisdiction of the present complaint.

Nevertheless, the district court found as a conclusion of law that Administrative Order No. 228 "is not clearly confiscatory nor arbitrary nor does it clearly deprive plaintiff of his property without due process of law." Hence the court ruled that the facts of the case did not justify the issuance of a temporary injunction, and accordingly entered its judgment, now appealed from, denying the temporary injunction.

On June 19, 1953, which was the same day the judgment now appealed from was entered, the legislature of the Commonwealth passed Act No. 97 which amended Law No. 228 of May 12, 1942, in respects not now material, and transferred administrative powers under it to a new agency called the Economic Stabilization Administration. In consequence thereof, the district court on June 23, 1953, granted plaintiff's motion that Felix Mejías, as Economic Stabilization Administrator, be substituted in place of the Secretary of Agriculture and Commerce as party defendant.

■ As we have stated above, Law No. 228 of May 12, 1942, provided that proceedings attacking the validity of a price regulation could be maintained only in the special Supplies Appeal Court; that that court had no power to issue a temporary injunction or an interlocutory order suspending the effectiveness of a price regulation pending final determination of its

validity; and that except as therein provided no court should have jurisdiction or power to consider the validity of any such regulation or to enjoin its enforcement. Plaintiff does not contend that these provisions of the underlying act constitute in themselves a denial of due process of law. Such contention could not successfully be made, in view of the decision in Yakus v. United States, 1944, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834, sustaining the constitutionality of similar provisions in the Emergency Price Control Act of 1942. In that connection, the Supreme Court had this to say, 321 U.S. at pages 440–442, 64 S.Ct. at page 674:

"The award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff. * * * Even in suits in which only private interests are involved the award is a matter of sound judicial discretion, in the exercise of which the court balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction. * * *

"But where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff. * * * This is but another application of the principle, declared in Virginian Ry. Co. v. System Federation, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789, that 'Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.'

"Here, in the exercise of the power to protect the national economy from the disruptive influences of inflation in time of war Congress has seen fit to postpone injunctions restraining the operations of price regulations until their lawfulness could be ascertained by an appropriate and expeditious procedure. In so doing it has done only what a court of equity could have done, in the exercise of its discretion to protect the public interest. What the courts could do Congress can do as the guardian of the public interest of the nation in time of war. The legislative formulation of what would otherwise be a rule of judicial discretion is not a denial of due process or a usurpation of judicial functions."

Of course the aforementioned provisions of Law No. 228 constitute, as plaintiff points out, only "a local prohibition on local courts to grant equitable relief", and are not, as such, applicable to restrict the powers of a federal court of equity. But in deference to the dominant public interest a federal court of equity remains free, under the developed principles of equity jurisdiction, as stated in the Yakus case, to withhold injunctive relief, "until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." With reference to this, the court below properly relied upon a decision of the Emergency Court of Appeals in Wing v. Arnall, Em.App., 1952, 198 F.2d 571, 572. In that case the court denied an application for a temporary injunction restraining the Director of Price Stabilization from enforcing the provisions of a ceiling price regulation, which application had been made under § 113(b) of the Act of June 30, 1952, 66 Stat. 302, amending § 408(a) of the Defense Production Act of 1950, 64 Stat. 808, 50 U.S.C.A.Appendix, § 2108(a), by expressly giving to the Emergency Court of Appeals "power to grant such temporary relief or restraining order as it deems just and proper". That court, speaking through Chief Judge Maris, after quoting from the Yakus case said the following (198 F.2d at pages 574–575):

"It is apparent that in the case of an application, such as this, for a temporary injunction against the enforcement of a price regulation of general applicability the complainants do not

seek to preserve the status quo but rather to change it in their own interest. It is equally clear that such a change, which would necessarily involve the temporary lifting of the price ceiling in question throughout the United States, might have repercussions in the economy of the nation which it would be impossible to calculate in advance and which would inevitably affect the public interest adversely in ways which could not possibly be compensated by an injunction bond. For no bond could indemnify all the persons in the country who might be affected, directly or indirectly, by the increased prices which might result from such action.

"When the public interest is involved courts of equity require much stronger grounds for granting temporary relief than they are accustomed to require when only private interests are involved. It is a cardinal principle of equity jurisprudence that a temporary injunction shall not issue in a doubtful case. We think, therefore, that in a case such as the one now before us a temporary injunction should be denied unless we are convinced with reasonable certainty that the complainants must succeed at final hearing. It is only in the very unusual case where we can be reasonably certain in advance of final hearing that the complainants will ultimately prevail that we would be justified in temporarily enjoining the price regulation to which they object. If after hearing the complainants' motion for a temporary injunction we are doubtful as to the ultimate outcome of the case a proper regard for the effect of injunctive action upon the stabilization objectives of the Defense Production Act requires that we do not disturb the status quo unless and until after full and final hearing we become certain that the complainants are entitled to the relief they seek."

■ Plaintiff apparently supposes that Administrative Order No. 228 has been conclusively established to be arbitrary or capricious, and unconstitutional, because, as found as a fact by the court below, plaintiff has on hand a certain *quantity of* rice which he imported into Puerto Rico at costs per cwt. greater than the wholesale prices fixed in the order. This is not necessarily so, though of course the administrator cannot expect to subsidize the Puerto Rican people indefinitely at the expense of the rice importers.

The statutory standard, as expressed in the local statute, adopting the language of the Emergency Price Control Act of 1942 and of the Defense Production Act of 1950, is that the price regulation must be "generally fair and equitable", and one that in the judgment of the administrator will effectuate the purposes of the act.

■ Certainly, if the challenged order is otherwise valid, it is not rendered invalid because the wholesale prices established therein are expressed in terms of specific dollars-and-cents ceilings, instead of in terms of a percentage mark-up on cost. Specific dollars-and-cents maximum prices lend themselves more readily to check by purchasers, and obviously contribute to more effective enforcement, as the federal Price Administrator discovered in the administration of the Emergency Price Control Act of 1942.

It is not denied that the maximum prices established in Administrative Order 228 were valid as applied to stocks of rice in Puerto Rico which had been bought in continental United States while millers' prices there were still subject to federal regulation.[3] For aught that the present record discloses, the administrator may have had

---

3. In his memorandum denying the application for reconsideration, the administrator explained: "In order to establish the ceiling prices of Order No. 228, the office of the Secretary of Agriculture and Commerce of the Commonwealth of Puerto Rico studied the cost of the supply in stock at the time in Puerto Rico several days before Order No. 228 went into effect. It was determined that the cost of 15% rice fluctuated between $11.-90 and $12.10 per hundred weight, c.i.f. San Juan and $11.60 per [hundred] pound weight c.i.f. San Juan for rice containing not more than 39% broken grains."

reason to anticipate that the rise in millers' prices which occurred just after federal controls were lifted was a temporary flurry, and that importers' costs, in the normal operations of the market, would soon revert to levels consistent with profitable operation at the wholesale prices established in the order. For all we know, the administrator might also have had reason to anticipate that the wholesale prices fixed in the order would in themselves have some tendency to restrain runaway inflation in millers' prices in continental United States because of the important share of Puerto Rico in the export market. Cf. Great Atlantic & Pacific Tea Co. v. Porter, Em.App. 1946, 156 F.2d 812.

In fact, the present record contains testimony by a Puerto Rican rice broker, called as an expert by the plaintiff, that "California rice No. 1, is presently priced between $12.00 and $12.50 f.o.b. dock San Francisco." This would tend to indicate that at the date of the preliminary hearing below (June 11, 1953), California prices had already begun to recede to normal levels. And since the argument of the appeal before us we have received, as a supplement to appellee's brief, an affidavit by the defendant administrator dated July 15, 1953, indicating that this downward trend of market prices in continental United States has continued. The text of the affidavit is set forth in the footnote.[4] Of course we do not accept the statements in this affidavit as proven fact; but the affidavit does strengthen our impression, derived from reading the present record, that the district judge necessarily could not have had before him, at the date of the hearing on the temporary injunction, a full and rounded picture of the long-range economic effect of Administrative Order No. 228 as the facts may appear at the final hearing.

It is recognized, as stated in Ben H. Rosenthal & Co., Inc., v. Porter, Em.App.1946, 158 F.2d 171, 173, "that the maximum prices in a regulation initially valid may become invalid due to a significant shift of economic factors; and vice versa." But a price regulation does not oscillate between validity and invalidity dependent upon day-to-day variations in mar-

4. "I, Felix Mejias, of legal age, resident of Rio Piedras, Puerto Rico, and Administrator of the Economic Stabilization Administration of Puerto Rico, under oath state the following facts of which I have personal knowledge:

"On June 27, 1953 the brokers in Puerto Rico of the rice mills O. E. Grosjean Rice Milling Co. and Farmers' Rice Growers Cooperative, both of San Francisco, California, announced that for California Pearl rice, not more than 15% broken, the price would be $12.25 per 100 lbs. C.I.F. Puerto Rico for all shipments made on June 1953 and thereafter. This is the rice for which the maximum price of $12.90 per 100 lbs. has been fixed in Puerto Rico for sales at wholesale.

"On July 10, 1953 the brokers for the California Rice Growers' Association announced a reduction of $1.00 per 100 lbs. (from $13.25 to $12.25) for all shipments of 15% broken Pearl rice from California in June 1953, July 1953 and thereafter, provided that a 15 days option be given them to cancel all shipments pending for August 1953. It was also announced by these brokers that for shipments made to Puerto Rico during June 1953 and July 1953 at $13.25 a refund would be made of $1.00 per 100 lbs. The

brokerage fee of 10¢ per 100 lbs. pockets would have to be paid to the brokers for August cancellations.

"On July 11, 1953 the brokers in Puerto Rico of the Producers' Rice Mill Co. of California offered 4,000 100 lbs. pockets C.I.F. Puerto Rico at $11.80 per 100 lbs. for the same type and grade of rice. On this date all 4,000 pockets have been sold to four importers.

"Mr. Jose Perez Berciano, broker for four Southern mills, offered today for August delivery Southern rice not more than 15% broken at $10.25 per hundredweight.

"All reductions in price referred to in this statement relate to old crop (1952–1953) rice, except the offer of $10.25 for Southern rice, which relates to the new crop.

"Shipments of rice to Puerto Rico during the ten weeks immediately preceding issuance of Order No. 228 of March 12, 1953, fixing maximum prices for the sale of rice in Puerto Rico, amounted to 601,582 hundredweights. Shipments for the following ten weeks, up to May 29, 1953, amounted to 770,792 hundredweights. Shipments for the month of June 1953, amounted to 194,712 hundredweights."

ket factors. It is the long-run trends that are significant in this connection. Price regulations are issued not only on the basis of past experience, but also on the basis of reasonable forecasts or anticipations of future market trends. If a price regulation is initially valid on this dual basis, the administrator is entitled to observe the actual results of its operation for a reasonable period of time, before a court could conclude that he was arbitrary or capricious in not revising the established maximum prices. See Ben H. Rosenthal & Co., Inc., v. Porter, supra, 158 F.2d at page 174; Superior Packing Co. v. Clark, Em.App. 1947, 164 F.2d 343, 352. This is especially true with regard to a commodity historically subject to seasonal fluctuations in prices. See Counselman v. Fleming, Em.App.1947, 161 F.2d 203, 205–206, certiorari denied 1947, 331 U.S. 861, 67 S.Ct. 1756, 91 L.Ed. 1867. See also Gillespie-Rogers-Pyatt Co., Inc., v. Bowles, Em.App.1944, 144 F.2d 361.

Our conclusion is that the district judge, on the basis of the showing made at the preliminary hearing, could not have been reasonably certain in advance of final hearing that the plaintiff would ultimately prevail; and therefore that he did not commit an abuse of discretion in denying a temporary injunction suspending the enforcement of the local price regulation of rice, a commodity of such vital importance in the economy of the island. In the last paragraph of his opinion supporting the denial of a temporary injunction, the district judge stated: "Of course, the market price has already been determined as to deliveries already made,[5] but the fact remains that the impact of the Order depends on a fluctuating market price. The Order is not separable, and we should not restrain its enforcement on the basis of previous experience, for it may not produce a loss as to future deliveries. Order 228 looks also to the future, and a restraining order or injunction has its ambit in the future."

One further consideration deserves to be referred to, though it was not discussed in the briefs or oral argument. 28 U.S.C. § 2281 provides as follows:

"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

It is clear that if the Commonwealth of Puerto Rico is to be deemed a "State" within the meaning of the above section, then the temporary and permanent injunctions sought in the present complaint could be granted only by a district court of three judges, one of whom must be a circuit judge, as provided in 28 U.S.C. § 2284; for the word "statute" comprehends all state legislative enactments, including those expressed through administrative regulations of general applicability. See Oklahoma Natural Gas Co. v. Russell, 1923, 261 U.S. 290, 292, 43 S.Ct. 353, 67 L.Ed. 659; Ex parte Williams, 1928, 277 U.S. 267, 271, 48 S.Ct. 523, 72 L.Ed. 877; Phillips v. United States, 1941, 312 U.S. 246, 251, 61 S.Ct. 480, 85 L.Ed. 800; Alabama Public Service Commission v. Southern Ry. Co., 1951, 341 U.S. 341, 343–344, footnote 3, 71 S.Ct. 762, 95 L.Ed. 1002.

The word "State" may in the context of a particular act of Congress have a broader connotation than a state in the federal Union. See Andres v. United States, 1948, 333 U.S. 740, 68 S.Ct. 880, 92 L.Ed. 1055, and cases cited. It is true that in Stainback v. Mo Hock Ke Lok Po, 1949, 336 U.S. 368, 69 S.Ct. 606, 93 L.Ed.

---

5. But see footnote 4 quoting the affidavit filed by defendant appellee in which it is stated that one important California miller has announced a refund of $1 per cwt. on shipments made to Puerto Rico during June and July, 1953.

741, the word "State" as used in § 266 of the Judicial Code (now 28 U.S.C. § 2281) was held not applicable to the territory of Hawaii. And we suppose the same was true of the territory of Puerto Rico as it was constituted under the Organic Act of 1917. See Benedicto v. West India & Panama Telegraph Co., Ltd., 1 Cir., 1919, 256 F. 417. But it may be that the Commonwealth of Puerto Rico—"El Estado Libre Asociado de Puerto Rico" in the Spanish version—organized as a body politic by the people of Puerto Rico under their own constitution, pursuant to the terms of the compact offered to them in Pub.L. 600, and by them accepted, is a State within the meaning of 28 U.S.C. § 2281.[6] The preamble to this constitution refers to the Commonwealth—"El Estado Libre Asociado"—which "in the exercise of our natural rights, we [the people of Puerto Rico] now create within our union with the United States of America." Puerto Rico has thus not become a State in the federal Union like the 48 States, but it would seem to have become a State within a common and accepted meaning of the word. Cf. State of Texas v. White, 1868, 7 Wall. 700, 721, 74 U.S. 700, 721, 19 L.Ed. 227. It is a political entity created by the act and with the consent of the people of Puerto Rico and joined in union with the United States of America under the terms of the compact.

A serious argument could therefore be made that the Commonwealth of Puerto Rico is a State within the intendment and policy of 28 U.S.C. § 2281. It is perhaps not important that the Congress could not have had the future Commonwealth of Puerto Rico in mind when it enacted 28 U.S.C. § 2281. See People of Puerto Rico v. Shell Co., 1937, 302 U.S. 253, 257, 58 S.Ct. 167, 82 L.Ed. 235. It would be necessary to go further and to say that if the evolution of the territory of Puerto Rico into its present status as a commonwealth under its own local constitution had been foreseen, Congress would have so varied the statutory language of 28 U.S.C. § 2281 as specifically to exclude the Commonwealth from the operation of the act instead of using the comprehensive word "State" susceptible of an interpretation including it. In the Stainback case, supra, the Supreme Court explained why it did not read the word "State" in old § 266 of the Judicial Code as including the territory of Hawaii. It said that the reason for the enactment of the three-judge court provision "was a congressional purpose to avoid unnecessary interference with the laws of a sovereign state. In our dual system of government, the position of the state as sovereign over matters not ruled by the Constitution requires a deference to state legislative action beyond that required for the laws of a territory. A territory is subject to congressional regulation." 336 U.S. at pages 377-378, 69 S.Ct. at page 611. If the constitution of the Commonwealth of Puerto Rico is really a "constitution"—as the Congress says it is, 66 Stat. 327,—and not just another Organic Act approved and enacted by the Congress, then the question is whether the Commonwealth of Puerto Rico is to be deemed "sovereign over matters not ruled by the Constitution" of the United States and thus a "State" within the policy of 28 U.S.C. § 2281, which enactment, in prescribing a three-judge federal district court, expresses "a deference to state legis-

---

6. It is interesting to note that appellant in this case made a separate constitutional argument that Administrative Order No. 228 constituted an undue and unconstitutional burden upon interstate commerce. In order to avoid decisions like Buscaglia v. Ballester, 1 Cir., 1947, 162 F.2d 805, holding that the implication of the commerce clause of the federal Constitution did not operate as a limitation on the territorial legislature of Puerto Rico, as constituted under the Organic Act of 1917, appellant argued that the "novel status" of the present Commonwealth of Puerto Rico falls within the concept of a State within the meaning of decisions holding that a State cannot unduly burden interstate commerce. We did not deal in the body of our opinion with this separate constitutional argument as to the commerce clause since local price regulation by a State, if otherwise valid, is not rendered invalid because of any incidental effect it may have upon the volume of interstate commerce.

lative action beyond that required for the laws of a territory" whose local affairs are subject to congressional regulation.

The foregoing point is one we suggest as deserving careful study and consideration, but one which we certainly shall not undertake to decide without benefit of briefs or oral argument in the present appeal from a judgment denying an application for a temporary injunction. Of course if the suggested point is well-taken it furnishes an additional reason why the single district judge committed no error in withholding a temporary injunction. And if the Commonwealth of Puerto Rico be deemed within the spirit, though not the letter, of 28 U.S.C. § 2281, this consideration would furnish an additional reason why the district judge, in the exercise of the discretion confided to a court of equity, should have been hesitant to interfere by way of injunction with the local price control program.

The judgment of the District Court is affirmed.