235 F.2d 347
 ANTONIO ROIG SUCRS. S. EN C. et al., Petitioners, Appellants,
v.
the SUGAR BOARD OF PUERTO RICO, Defendant, Appellee.
EASTERN SUGAR ASSOCIATES, (a Trust), Petitioners, Appellants,
v.
The SUGAR BOARD OF PUERTO RICO.
EASTERN SUGAR ASSOCIATES (a Trust),
v.
COLONOS DE CANA DE SANTA JUANA, Inc., et al., Appellees.
 Nos. 4959, 4960, 4972.
 United States Court of Appeals First Circuit.
 July 17, 1956.
 
 Francisco Castro-Amy, San Juan, P.R., with whom James R. Beverley and R. Castro-Fernandez, San Juan, P.R., were on brief, for Antonio Roig Sucrs. S. en C. et al., appellants.
 E. T. Fiddler, San Juan, P.R., with whom Jose G. Gonzalez, Tomas I Nido and Carlos J. Faure, San Juan, P.R., were on brief, for Eastern Sugar Associates (A Trust), appellant.
 Abe Fortas, Special Asst. Atty. Gen., of Puerto Rico, J. B. Fernandez Badillo, Asst. Atty. Gen., of the Commonwealth of Puerto Rico, with whom Jose Trias Monge, Atty. Gen. of Puerto Rico, and Arnold, Fortas & Porter, Washington, D.C., were on brief, for The Sugar Board of Puerto Rico, appellee.
 Colonos de Cana de Santa Juana, Inc., appellee, submitted on brief of The Sugar Board of Puerto Rico by leave of Court.
 Before MAGRUDER, Chief Judge, and MARIS and WOODBURY, Circuit Judges.
 WOODBURY, Circuit Judge.
 
 
 1
 These appeals under Title 28 U.S.C. § 1293 from final decisions of the Supreme Court of Puerto Rico present questions of the validity under the Constitution of the United States of certain provisions of the Sugar Act of Puerto Rico. Act No. 426 of May 13, 1951; Laws of Puerto Rico, 1951, page 1138. In addition Eastern Sugar Associates in its appeal No. 4960 alleges error in that the Supreme Court of Puerto Rico deprived it of a forum in which to defend its constitutional rights.
 
 
 2
 The sugar problem of Puerto Rico is an old, obstinate, and difficult one. And its solution is of vital importance for we may take judicial notice of the well known fact that the economy of the Island rests in major part upon the growing of sugar cane and the processing of the cane into raw sugar. Moreover, the growing of the cane and its grinding are closely related enterprises for the reason that while the cane is grown in large part by independent farmers called colonos, a great many of whom have only small holdings, it is also grown by the processors themselves, usually on large holdings; and furthermore, since cane is heavy and bulky and must be ground within twenty-four hours after it is cut, the colonos are per force dependent upon the services of some nearby mill or central, each one of which represents a substantial capital investment.
 
 
 3
 The Sugar Act of Puerto Rico Supra, is the third of a series of statutes enacted by the local legislature since 1937 for the purpose of providing a comprehensive scheme for the regulation of the sugar industry in both its agricultural and its industrial aspects. The appellants do not challenge the power of the insular legislature either to enact such statutes or to include therein provisions regulating the compensation which the colonos are entitled to receive for their cane from the centrals. Indeed, the legislative power in the premises could not successfully be attacked in view of the decisions of this court in Vidal v. Fernandez, 1 Cir., 1939, 104 F.2d 606, and Roig v. People of Puerto Rico, 1 Cir., 1945, 147 F.2d 87. The appellants here challenge only certain features of the 1951 statutory scheme for compensating the colonos for their cane.
 
 
 4
 The appellants in the first two appeals, Nos. 4959 and 4960, question the constitutional validity of § 7 of the Sugar Act of Puerto Rico as interpreted by the Sugar Board created by the Act in its Rule 2 and by the Supreme Court of Puerto Rico. We shall consider first the contentions of these appellants and then pass on to consideration of the contention of the appellant in the third appeal.
 
 
 5
 Historically the centrals in Puerto Rico have either purchased cane from the colonos at a price per ton calculated on the sugar content of the cane or have ground cane for the colonos on the toll basis, the amount of toll also calculated on the sugar content of the cane. The earlier insular sugar acts of 1937 and 1942 sanctioned both of these alternative methods of compensating the colonos but regulated the amount of toll to be taken or the price to be paid by the centrals. However, at least in later years, payment in cash became the usual method of compensation. The Sugar Board found and it is not disputed that during the 1952 grinding season, 26 (one on an experimental basis for that year only) of the 33 centrals grinding colonos' cane[1] paid for it in cash, and of the 7 remaining centrals operating on the toll basis, 4, al, Eastern's, delivered the colonos' share of the sugar derived from their cane directly to them, or to some person authorized to receive it for them, and 3 under agency agreements sold the colonos' share of the sugar with their own and settled with the colonos for cash. The Supreme Court of Puerto Rico held that the Sugar Board in its Rule 2 correctly construed § 7 of the Sugar Act as altering this historic pattern of dealing between centrals and colonos by requiring all centrals, regardless of their previous practice, to liquidate with the colonos in cash except as to those colonos who gave the central notice within a period of time fixed by the Act of their desire to have their cane ground on the toll basis. The appellants contend that this statutory requirement that the centrals operate on the cash basis unless the colonos elect otherwise deprives them, the centrals, of their property and of their freedom of contract without due process of law in violation of either the Fifth or the Fourteenth Amendment of the federal Constitution.[2]
 
 
 6
 We take our text from the opinion of the Supreme Court of the United States in Nebbia v. People of State of New York, 1934, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, wherein the Court enunciated the general principles governing cases of this sort. It is said by way of introduction on pages 523 and 524 of 291 U.S., at page 510 of 54 S.Ct.:
 
 
 7
 'Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest. * * *
 
 
 8
 '* * * These correlative rights, that of the citizen to exercise exclusive dominion over property and freely to contract about his affairs, and that of the state to regulate the use of property and the conduct of business, are always in collision. No exercise of the private right can be imagined which will not in some respect, however slight, affect the public; no exercise of the legislative prerogative to regulate the conduct of the citizen which will not to some extent abridge his liberty or affect his property. But subject only to constitutional restraint the private right must yield to the public need.'
 
 
 9
 And on page 525, of 291 U.S., on page 510 of 54 S.Ct., the Court marked the bounds of constitutional restraint under the due process clauses. It said:
 
 
 10
 'The Fifth Amendment, in the fiele of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relating to the object sought to be attained. * * *'
 
 
 11
 Then, on page 537 of 291 U.S., on page 516 of 54 S.Ct., the Court stated the function of the courts in the premises by saying:
 
 
 12
 'So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court functus officio.'
 
 
 13
 We do not understand any of the appellants to quarrel in the least with these general propositions. The attack of the appellants in the first two appeals upon § 7 of the statute as interpreted by the Sugar Board and the Supreme Court of Puerto Rico, is essentially two-pronged. They say that the only conceivable purpose of § 7 of the Act as construed is to improve the economic position of a single group in the community, the colonos, and hence cannot be said to serve a 'public purpose,' and that the statute, because it forces the centrals to 'enter a new business,' i.e. the purchase of cane from the colonos, is necessarily arbitrary, capricious, and unreasonable. We find no merit in either contention.
 
 
 14
 Certainly § 7 by requiring the centrals to pay in cash unless the colono otherwise elects deprives the centrals of their power unilaterally to decide whether they will grind colonos cane on the toll basis or purchase it-- whether they will pay the colonos in kind or in cash. And no doubt the effect of this limitation on the central's freedom of contract was intended to and does redound primarily to the economic benefit of the colonos. Furthermore, we may assume that the purpose of the enactment was to strike an economic balance between groups with conflicting interests by improving the economic lot of the diffuse and, from the bargaining standpoint, weaker group, the colonos, at the expense of the relatively more compact and contractually stronger group, the centrals. But it does not necessarily follow from these considerations that the section violates the requirements of due process.
 
 
 15
 We have already shown by our first quotation from Nebbia v. People of State of New York that although the use of property and the making of contracts are normally matters of private right, both may be regulated in the public interest. And it was held long ago that such regulation may take the form of requiring payment in cash instead of payment in kind. Knoxville Iron Co. v. Harbison, 1901, 183 U.S. 13, 22 S.Ct. 1, 46 L.Ed. 55; Dayton Coal & Iron Co. v. Barton, 1901, 183 U.S. 23, 22 S.Ct. 5, 46 L.Ed. 61. In those cases to be sure the Court was dealing with employment contracts but that is a distinction without any difference in applicable principle. Furthermore, legislation designed to benefit one group in the community at the expense of another has been repeatedly sustained as in the public interest and hence not vulnerable for that reason alone to attack on due process grounds. See Holden v. Hardy, 1898, 169 U.S. 366, 18 S.Ct. 383, 42 L.Ed. 780. For instance, legislation benefiting borrowers of money at the expense of lenders was sustained in Griffith v. State of Connecticut, 1910, 218 U.S. 563, 31 S.Ct. 132, 54 L.Ed. 1151; legislation regulating fire insurance premiums for the benefit of policyholders contrary to the economic interest of the insurers was sustained in German Alliance Ins. Co. v. Lewis, 1914, 233 U.S. 389, 34 S.Ct. 612, 58 L.Ed. 1011, and legislation regulating the compensation of insurance agents was sustained in O'Gorman & Young, Inc., v. Hartford Fire Ins. Co., 1931, 282 U.S. 251, 51 S.Ct. 130, 75 L.Ed. 324. Even more clearly in point is Nebbia v. People of State of New York, supra, wherein legislation for the primary benefit of dairy farmers and milk consumers was sustained even though it imposed substantial burdens upon processors and middlemen. Nor is the statute vulnerable to attack because the legislature in enacting it may well have taken the relatively weak bargaining power of the colonos into consideration. The relative bargaining weakness of the group to be benefited is a factor which a legislature is entitled to consider in enacting a statute. West Coast Hotel Co. v. Parrish, 1937, 300 U.S. 379, 398, 57 S.Ct. 578, 81 L.Ed. 703.
 
 
 16
 The whole question on this phase of due process is whether it can be found that the means selected by the legislature have a real and substantial relation to some public purpose as distinguished from a merely private one.[3] The answer is not far to seek, for, as already pointed out, the colonos are a large and important group whose economic welfare can well have been considered by the legislature as not only important to themselves but also important to the economic health of the island as a whole. Indeed, this is not the first time the legislature of Puerto Rico has taken steps for their particular benefit. See the earlier sugar acts of 1937 and 1942 considered by this court in the Vidal and Roig cases cited early in this opinion. Certainly their economic well-being is as important to the economy of Puerto Rico as the particular groups singled out for protection in the state legislation held valid in the Griffith and other cases cited above; the colonos are not less important to the insular economy than are the dairy farmers of New York to the economy of their state.
 
 
 17
 Herein lies the distinction between this case and Thompson v. Consolidated Gas Utilities Corp., 1937, 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510, upon which the appellants heavily rely. For in that case the Court was unable to discover that the means selected in the regulation there under attack bore any real and substantial relation to a public purpose to conserve the state's supply of natural gas, but instead was forced to find that the means selected served only the private purpose of aiding gas well owners in a given area who lacked an outlet to market for their gas at the expense of other well owners in the area who had provided themselves with an outlet. It found that the means selected, transportation of gas from the wells of those who did not own pipe lines by the well owners who had pipe lines, served no public purpose to conserve the state's supply of gas but served only the private purposes of the well owners without pipe lines.
 
 
 18
 This brings us to the other phase of due process, for even though a statute may serve a public purpose, to comply with due process requirements it must serve that purpose in a way which is not arbitrary, capricious, or unreasonable.
 
 
 19
 The appellant's position is that § 7 of the Sugar Act of Puerto Rico, as construed, offends this phase of due process, i.e. is arbitrary, capricious, and unreasonable, because it forces the centrals to 'engage in a new business,' that is to say, the business of buying cane from the colonos and therefore necessarily marketing the sugar derived therefrom with the sugar derived from the central's own cane. This argument applies with particular force to Eastern's four centrals which have never purchased cane from the colonos or undertaken to market the colonos' share of the raw sugar derived from their cane. But we cannot see that even these centrals are forced to embark upon a new business. They have always ground their own administration cane and also that of colonos in the neighborhood, and, of course, they have also always sold the sugar from their own cane and the sugar taken as toll for grinding the colonos' cane. They have been processors of cane and marketers of sugar in the past and they remain so in the future. Section 7 of the Act does not require them to embark on any new enterprise. It regulates the centrals' contractual relationship with the colonos by requiring all centrals to conform to the practice voluntarily adopted by three-quarters of the centrals in Puerto Rico. This forces the centrals affected to buy colonos cane and market the sugar derived therefrom with their own, no doubt for the reason that the legislature thought the centrals to be in a better position market-wise than the colonos, particularly the smaller ones. This extends the scope of the business of the affected centrals but it does not force them into a kind of business they have never done before.
 
 
 20
 Now we come to the contention advanced by Eastern Sugar Associates alone in its appeal No. 4960, i.e. the contention that the Supreme Court of Puerto Rico fell into clear error by depriving Eastern of a forum in which to defend its constitutional rights.
 
 
 21
 This contention rests upon the refusal of the Supreme Court of Puerto Rico to examine the record in order to decide whether at a public hearing held by the Sugar Board any substantial evidence had been introduced to support the findings of fact made by the Board on the basis of which it rested the legal conclusion embodied in its Rule 2; that is to say its conclusion that § 7 of the Sugar Act, properly construed, required the centrals to pay the colonos in cash unless they elected otherwise. The Supreme Court of Puerto Rico based its refusal to review the Sugar Board's findings of fact on the ground that its Rule 2 was general in scope and legislative in character and therefore could have been promulgated by the Board without any hearing at all provided at some point persons affected by the Rule were afforded an opportunity to challenge it judicially. And the court pointed out that under § 15 of the Act, had Eastern Chosen to invoke its provisions, Eastern could have filed a complaint with the Sugar Board alleging that Rule 2 was invalid as applied to it, that on such a complaint the Board was required to hold a quasi-judicial hearing at which Eastern could introduce evidence of the financial impact of the Rule upon it, and that after such a hearing the Board would have to make findings of fact which would be subject to judicial review.
 
 
 22
 Eastern agrees that the Sugar Board's Rule 2 is general ins scope and legislative in character. Conceding that much we fail to see how it can be said that the action taken by the Supreme Court of Puerto Rico in the premises does violence to the rule of Bowles v. Willingham, 1944, 321 U.S. 503, 519, 521, 64 S.Ct. 641, 88 L.Ed. 892, upon which it relied. Nevertheless Eastern, in spite of its concessions, strenuously contends that the action of the Supreme Court of Puerto Rico deprived it of a forum in which to defend its constitutional rights.
 
 
 23
 Eastern's argument is not easy to understand or to follow. It seems to rest, however, upon the premise that in some way it was incumbent on the Sugar Board, before it construed § 7 of the Act as it did, to hold a public hearing, introduce positive evidence thereat which persons affected were given an opportunity to counter or refute, and make findings resting upon that evidence, to establish that as it construed the section it was neither arbitrary, capricious, nor unreasonable and also served a proper public purpose, and furthermore that the Supreme Court of Puerto Rico erred in affirming the Sugar Board's construction of the section in the absence of such findings. Several errors in Eastern's premise are obvious. It will suffice only to say that it is up to the person attacking the validity of a general administrative regulation or a statute to come forward with the facts on which he bases his assertion of unconstitutionality. Eastern, as we have seen, had an opportunity to make such an attack by invoking the procedures provided in 15 of the Act. It failed to take advantage of the opportunity afforded. Wherefore a presumption of validity attaches to both Rule 2 and the Act itself. For in Thompson v. Consolidated Gas Utilities Corp., 1937, 300 U.S. 55, 69, 57 S.Ct. 364, 371, 81 L.Ed. 510, it is said to be settled that 'to all administrative regulations purporting to be made under authority legally delegated there attaches a presumption of the existence of facts justifying the specific exercise.' And in United States v. Carolene Products Co., 1938, 304 U.S. 144, 152, 58 S.Ct. 778, 783, 82 L.Ed. 1234, it is said that even in the absence of a statement of the legislative purpose for enacting an economic regulation 'the existence of racts supporting the legislative judgment is to be presumed, for regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators.'
 
 
 24
 We turn now to the third appeal in this trilogy.
 
 
 25
 On this one we are concerned with another section of the Sugar Act of Puerto Rico, § 6, which regulates in detail the allocation between the centrals and the colonos of the expenses, and the furnishing of services, incident to hauling, loading, and transporting the colonos' cane after it is cut in the field and until it is delivered to the central. The section is long and rather involved. A brief summary of its salient provisions will suffice.
 
 
 26
 It provides in its subsection (a) that when the central undertakes to transport cane direct from the colono's farm, it must pay the colono 7 1/2 cents per ton for moving the cane from the place on the farm where it is cut to the place on the farm where the central picks the cane up. It provides in its subsection (b) that when the colono transports his cane to the central with his own equipment, or with equipment which he leases, the central must pay the colono 15 cents per ton plus 5 cents per ton per kilometer. It its subsection (c) the section provides that when the central has in the past provided the colono with portable tracks and rolling stock to be used for hauling the cane directly from the farm, it must continue to do so and in addition pay the colono 5 cents per ton for carrying the cane across the field to the track. And its subsection (d), as construed by the Sugar Board, requires that when the central takes delivery of cane at a siding off a colono's farm where it also takes delivery of the cane of other colonos, the central must provide hoisting equipment to load the cane onto its cars and men to operate that equipment. In a general sort of way these provisions require the centrals to purchase the colonos' cane F.A.C. (free after cutting) to coin a phrase. And the Supreme Court of Puerto Rico in a companion case decided at the same time as the one appealed from (Antonio Roig, Sucrs. v. Sugar Board, not yet reported in English) said that in so doing the section 'followed the customs and historical pattern of the sugar industry in Puerto Rico.'
 
 
 27
 The present appellant does not challenge the constitutional validity of all the requirements of the section. Its attack is concentrated on the provisions of subsections (a) and (c), that is, the requirement that the centrals pay the colonos 7 1/2 cents per ton for hauling the cane to an on-farm delivery point, and the requirement that the centrals provide hoisting equipment and men to operate it at off-farm common delivery points. It says that these two requirements deprive the centrals of their property without due process of law in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States.
 
 
 28
 Eastern's constitutional argument on this appeal, and it makes no other, is basically the same as its constitutional argument on appeal No. 4960 which we have already considered and rejected. Repetition would be pointless. It will suffice to say that Eastern's argument treats the two subsections of § 6 of which it complains as though they were isolated instances of price regulation, whereas in fact, as the Supreme Court of Puerto Rico pointed out in the Antonio Roig case cited above, the subsections complained of are, with the other provisions of § 6, and in addition § 7, and also § 5 with which we are not concerned, but integral parts of a comprehensive statute designated to regulate the compensation of the colonos on an over-all basis.
 
 
 29
 The general purpose served by the statute as a whole is a public one, as we have already pointed out. The specific purpose of the provisions of § 6 is generally to require the centrals to purchase cane from the colonos at what we have called F.A.C. or free after cutting. Thus, by hypothesis, the work done on the cane by the colonos after cutting is done for the central, and the provisions of § 6 fix the colonos' compensation for that work. Since the means selected for fixing the colonos' compensation for that work bear a real and substantial relation to the object sought to be attained we find no constitutional infirmity in the section.
 
 
 30
 The judgments of the Supreme Court of Puerto Rico are affirmed.
 
 
 
 [1]
 One additional central ground only its own or, as it is called, 'administration' cane
 
 
 [2]
 The requirements of 'due process' in the present situation as will presently appear are the same under either amendment so once again we need not decide which amendment to apply. See Mora v. Mejias, 1 Cir., 1953, 206 F.2d 377, 382 and id., 1 Cir., 1955, 223 F.2d 814, 816
 
 
 [3]
 These appellants do not contend that the legislative means selected do not have a real and substantial relation to the economic welfare of the colonos. Their argument is that the means selected serve only the colonos' ends which they say makes the statutory purpose private instead of public