CENTRAL MONSERRATE, INC. ET AL., Petitioners, *v.* SUGAR BOARD OF PUERTO RICO, Respondent.

No. 17. Submitted June 4, 1961.—Decided June 27, 1961.

106

R. *Rivera Zayas*, G. *Rivera Cestero*, *Milton F. Rúa*, and A. *Segurola de Diego* for petitioners. *Alejandro Romanace* for defendant.

MR. JUSTICE SERRANO GEYLS delivered the opinion of the Court.

This appeal raises various important questions in the administration of the Sugar Act of Puerto Rico (Act of 1951, Sess. Laws, p. 1138), particularly § 8 thereof (5 L.P.R.A. § 377). Petitioner Central Monserrate, Inc., submitted to the Sugar Board a report of its shipment and marketing expenses regarding the 1953 crop season. After several proceedings which we shall hereafter outline, the Board finally refused some of the items. Upon the request of petitioners we issued a writ of review. Later, we suspended the Board's order after the corresponding bail was submitted to us. Sections 7 and 8 of the Sugar Act provide:

"Section 7.—The provisional liquidations of sugar pertaining to the *colonos* shall be made fortnightly or monthly by the central, as may be determined by the Board, or in default thereof, for the liquidation period used during the next preceding year, taking as the value of the sugar, for its liquidation, the average price of the sugar of Puerto Rico paid C. I. F. New York corresponding to the fortnight or month in which the cane has been delivered. Of the average prices of the sugar of Puerto Rico of 96 degrees of polarization in the New York market, determined as above prescribed, the central may deduct the sums it may deem necessary to cover shipment and marketing expenses in all the cases of such *colonos* as may not choose to receive their share in sugar as hereinafter provided; *Provided, That* whenever the *colono* believes that the sum deducted by the central for such reason is excessive, he may request the Board to fix the sum which the central shall provisionally deduct for

such purposes, and the Board is hereby empowered to do so; *Provided, further*, that the Board may, after a hearing of all the interested parties, provide another system of liquidation which may be fair and reasonable.

"Whenever the *colono*, before December 1 prior to the beginning of the grinding season, so notifies the central, the latter shall be bound to deliver the total amount of sugar of 96 degrees pertaining to him in accordance with this Act and the regulations promulgated hereunder.

"The *colonos* who choose that their share of the proceeds of their cane be liquidated in sugar, shall enjoy the right of storage in the warehouses of the central until the 31st day of December following the grinding season during which said sugar was produced, without payment of any amount whatsoever for the enjoyment of said right.

"The central shall guarantee the *colonos* two hundred and fifty (250) pounds of sugar of 96° per each bag delivered to purchasers up to the 31st day of October following the grinding season during which the *colono's* sugar was produced. Any amount in dollars resulting in excess of said guarantee, due to any difference in weight or polarization, shall inure to the benefit of the central. Any amount in dollars in default of said guarantee, due to any difference in weight or polarization, shall be reimbursed to the *colonos* by the central. In both cases, said readjustment payments shall be made in cash and not in sugar.

"The central shall deliver sugar to the *colonos* in new bags of two hundred and fifty (250) pounds net each, and in case the central is compelled to use old bags, it shall compensate the *colonos* for the penalty imposed on the sugar due to the use of said old bags.

"Section 8.—The final liquidations of the shipment and marketing expenses shall be made after the central has sold all the sugar and has determined the actual shipment and marketing expenses incurred, which expenses must be previously approved by the Board; *Provided*, that if the Board or any *colono* does not agree to the fairness or correctness of said expenses, or deems that said expenses or any part thereof are not deductible under the provisions of this Act, the Board, either at the request of the *colono* or *motu proprio*, shall hold a hearing at which the parties shall have an opportunity to make their claims and

submit proof of the rights which they may think they have, and the central may not make the final liquidation until the Board decides the controversy."

Petitioners and the amici curiae submit to us questions relating to the scope of the powers of the Board, to the procedure employed by said Board, and to the refusal of several specific items. We shall consider these questions separately.

## I

 The Board refused petitioner the expense items of stacking and loading the sugar in trucks in the leased warehouses and the rental of warehouses, and reduced the item of transportation from the factory to the docks, from the factory to leased warehouses, and from the latter to the docks. It considered that the first two items and the amount reduced from the other were not "shipment and marketing" expenses. The power of the Board to make such a determination was challenged setting forth that § 8 only grants it the power to refuse the expenses if the latter are not "actual [expenses] incurred" or if it "does not agree to the fairness or correctness of said expenses," but it may not refuse them because it deems that said expenses are not "shipment and marketing" expenses. These arguments are not valid.

Section 7 regulates the provisional liquidations of sugar made by the centrals to its colonos. Of the average prices of sugar fixed by law, each central may "deduct the sums it may deem necessary to cover shipment and marketing expenses in all the cases of such *colonos* as may not choose to receive their share in sugar...." This is not, however, an absolute power of the central. Even in this case of "provisional" liquidation, the law subjects the mill to two interventions: 1. at the colono's request, whenever the latter believes that the sum is excessive, the Board may fix the sum which the central shall provisionally deduct; 2. the Board may provide "another system of liquidation which may be fair and reasonable," after a hearing of all the interested parties.

Section 8 establishes the procedure to make the final liquidation of shipment and marketing expenses. It requires the previous approval by the Board of "actual expenses incurred" and creates a procedure to challenge said expenses according to the fairness and correctness in agreement to law. It seems clear that these two sections grant to the Board ample powers to investigate and decide with a view to protecting the interests of the colonos, who because of the economic structure of the industry have a very scarce, if any, participation in the procedure of selling the sugar, and constitute, besides, a weak economic group. *Antonio Roig Sucrs. S. en C.* v. *Sugar Board of Puerto Rico*, 235 F.2d 347, 351–52 (1956); *cert. denied* 352 U.S. 928 (1956). It is inconceivable that a power of this sort does not embrace within its scope the elementary authority to disapprove the expenses which are really not "shipment and marketing" expenses, and that the Board be forced to accept under this label, any expense claimed by the central, once it has been actually incurred, as for example, the business expenses of the administrator, or the depreciation of the automobile used by the engineer.

The Acts prior to that of 1951 lend support to the legislative concern on this matter. In the Act of 1937 as well as in the Act of 1938, a maximum was fixed to cover said expenses, which was first of fifteen cents per hundredweight and later twenty-five cents. [1] Act No. 221 of May 12, 1942 (Sess. Laws, p. 1176) delegated on the Public Service Commission the regulation of this and other aspects of the sugar industry and said body required that at the end of the sale and delivery of the sugar each sugar company should submit thereto a detailed report of said expenses "for approval thereof by this body." The company should report "the real and total cost of said expenses" and the regulations forbade,

---

[1] Section 11 of Act No. 112 of May 13, 1937 (Sess. Laws, p. 261) as amended by Act No. 213 of May 15, 1938 (Sess. Laws, p. 411).

also, that "an amount greater than the average per hundred-weight of sugar in which the sugar company incurred for said concepts grounded on the total quantity of sugar which the latter had sold and exported," [2] be deducted from the colono.

■ The absence of the definition of the term "shipment and marketing expenses" in the Sugar Act of 1951 and the powers conferred upon the Board, obey, no doubt, to the legislative intent of delegating upon that body the reasonable regulation of the matter, and of leaving, therefore, to the administrative discretion the determinations which require the daily attention to diverse economic factors and of industrial organization. The standards which govern that delegation do not violate any constitutional mandate. *P.R. Telephone Co. v. Tax Ct.; Sec. of the Treas., Int.*, 81 P.R.R. 948, 968 (1960).

It seems indisputable, in the light of the text and purposes of the 1951 Act and of its legislative precedents, that §§ 7 and 8 of the above-mentioned Act confer upon the Sugar Board the power to disapprove items submitted to the same as "shipment and marketing expenses" when they are not actually such.

■ Petitioners, however, say that the Board may not disapprove specific items of the shipment and marketing expenses unless the colonos involved challenge them before the Board. The difficulty in accepting the argument lies in the fact that the Act states the contrary.

Section 8 requires that the final liquidations of the shipment and marketing expenses must be "previously" approved by the Board. Immediately following it says that "provided that the Board or any colono does not agree" therewith, "the Board, either at the request of the colono or motu proprio"

---

[2] Examine § 11, paras. (*g*), (*h*), and (*i*) of the General Regulations for the Sugar Companies, enacted by the Public Service Commission on July 24, 1946.

shall hold a hearing to decide the controversy. It is evident that this provision grants to the Board the power to initiate and continue to the end the procedure to review the final liquidations submitted thereto by the central, regardless of whether the colonos involved complain about the matter or not. There is, of course, nothing novel or unusual therein. Due to well-known reasons the official regulation of economic and social activities have been chanelled for a long time through administrative bodies to which ample powers of investigation, regulation and decision as to particular controversies are conferred. Since the earliest years the need arose of granting to these institutions the power to take cognizance in said proceedings motu proprio, because experience has shown that the group for whose benefit these programs are instituted, lacked effective means to enforce their new rights and the establishment of ordinary adversary procedures in such cases would have been ineffective. From § 8 as well as from other provisions of the Sugar Act it appears with blinding clearness that that was the plan pursued by the Legislature in regulating the sugar industry.

█ It is alleged besides, that the action of the Board is unlawful because it is retroactive, and it is set forth that at the time the central made the deductions, there was no regulation or order from the Board forbidding the same. Once more the law defeats the argument. It is obvious that the powers of the Board to investigate the shipment and marketing expenses and to decide the specific controversies originated from those investigations, spring from § 8 and do not require for their legal validity any administrative regulation whatsoever, even though the Board may establish, of course, whatever regulation may render the procedure more serviceable and precise. As in this case it is a question of expenses corresponding to the 1953 crop season, and as the Sugar Act went into effect on May 13, 1951, petitioners were completely aware of the fact that the afore-mentioned expenses would

have to be submitted to the Board's investigation for their final approval.

■■ Petitioners' last allegation in this aspect of the appeal maintains that the Board's action is unconstitutional because the retroactive payment of amounts not claimed by the colonos deprive them of their property without the due process of law and impairs the contractual obligations. The first alleged constitutional defect is not elaborated and as to the second, it is alleged that the prejudice consists in that when the colonos receive the payment of profits distributed by the Federal Department of Agriculture they admitted, by not complaining, the correctness of the shipment and marketing expenses incurred by the central, and consequently, the colonos were making a valid contract with the latter regarding the above-mentioned expenses. Apart from the fact that this argument was presented in the petition and was not argued in the briefs, for which reason it should be understood as waived, *Labor Relations Board* v. *Simmons Int'l., Ltd.*, 78 P.R.R. 360, 368 (1955), it is so obviously without merit on its face that it is unnecessary to discuss the same.

## II

■■ Petitioners, and mainly the amici curiae, challenge the procedure followed by the Board in this case. They allege that it is a quasi-judicial proceeding; that it was up to the Board, as plaintiff party, to carry the burden of the proof and to show, therefore, that the expenses deducted by the central were not really incurred or were excessive or unnecessary, and that the Board failed to do so; that the Board "did not warn Central Monserrate by notifying it what was attempted against it"; that in fact, "Central Monserrate never knew against what it was defending or compelled to defend itself"; and they request this Court to clearly outline to the Board the procedure that the latter must follow in each case and "that it be established once and for all that the liberality and broadness in administrative proceedings does not imply

the anarchy or the exercise of omnimodous powers by which the trier may also investigate and convict beforehand." Let us see whether the account of the events in this case lends support to such vehement expressions.

On June 7, 1954 the central submitted to the Board its report on shipment and marketing expenses as to the 1953 crop season, and on December 1, 1954 the Board transmitted an order refusing certain items pursuant to a detailed report which was attached thereto, prepared by the Auditor of the Board and previously approved by the latter. Said report fully identified the refused items and the amount granted by the Board. The order informed the central of the Board's intention to hold a hearing on the following December 8, to hear the objections of the central, if any. It seems that said hearing was suspended. On December 18 Central Monserrate submitted to the Board an "Opposition to the Adjustment of Shipment and Marketing Expenses" wherein it stated in detail its objections to the refusal order. There is nothing in said opposition which impliedly or expressly shows that petitioner was not fully informed of the administrative action. On January 13, 1955 a hearing was held, which was suspended at the request of the central, after the participation of the Sugar Producers Association as amici curiae in the proceeding was accepted. On the following February 15, petitioner submitted a writing to the Board entitled "Additional Ground for Opposition to the Adjustment of Shipment and Marketing Expenses." In that writing the omission or lack of notice was not alleged either. On the following day the hearing was had on the merits and the central and the association appeared duly represented. The Administrator of the Central testified at said hearing. The afore-mentioned lack of notice was not formally raised either. Later the parties submitted their briefs in support of their interpretation of § 8.

On April 7 the Board entered a lengthy Order, subtitled "Statement and Findings of Fact, Opinion and Order." [3] It contains in detail the refused items and the grounds on which the refusal rests and orders the central to make the corresponding payments to the colonos.[4] On April 11 the central submitted to the Board a well-grounded "Motion for Reconsideration" but again it did not allege therein lack of information or a deficiency of evidence. Its arguments raised questions of law identical to those before us, and which were the same on which petitioner had based its allegations from the beginning. Then, after several continuances, the Board reopened the case on June 1, suspended its decision of April 7, and set June 15 as the day to receive additional information at a hearing. Several centrals attended thereto, among which was petitioner, and two witnesses made statements, one of them being an actuary. On the following day said witness gave a report to the Board as to the item of maritime insurance and the latter sent copies to all the centrals involved, including Central Monserrate. The latter and Central Juanita, Inc., objected to the Board's taking said report into consideration. The Board overruled that objection.[5] On October 11 another hearing was held on the shipment and marketing expenses and others were held thereafter on November 14 and 25. Therein persons who were in charge of the examination of the report of the centrals testified as to said expenses and were subjected to intense examinations and cross-examinations. Finally, the Board issued a decision on January 18, 1956, wherein it reinstated its previous decision of April 7, 1955, with several amendments.

One can hardly conceive how an administrative body can more faithfully comply with its duty of informing its actions

---

[3] In this opinion it was set forth that it was the amicus curiae who raised the question of procedure before the Board, apparently by means of a memorandum which does not appear in the record.

[4] One of the members of the Board dissented.

[5] It is not alleged before the bench that said action was erroneous.

to those institutions and persons subject to its orders, and of giving them an absolute opportunity to defend themselves. The record in this case reveals remarkable care on the part of the Board regarding these matters and, consequently, that petitioner was fully informed of the decisions of the Board and of the grounds on which they were based, and it had numerous opportunities to examine the Board's evidence and to present its own. The imputation of anarchy, indefenselessness, and partiality that the amici curiae have submitted against the Board are therefore, wholly undeserving.

We should correct an error of perspective which emerges from the allegation of the amici curiae. In the present case there was scarcely any argument as to the items disapproved by the Board and as to the amount thereof. Practically from the beginning, the controversy only dealt with the scope of the powers of the Board as defined by § 8 and with the interpretation of the phrase "shipment and marketing expenses," as used in said section. These are admittedly questions of law. The Board gave several opportunities to the parties to explain these matters through oral and written arguments and through the introduction of witnesses acquainted with the industry. Having offered these opportunities of expression, the administrative body was free to make the legal interpretation which it deemed necessary and convenient, and to resort to those sources, including its own experience, which are ordinarily employed by administrators and judges in order to enlighten the interpretative function. "It is fundamental to the law that the submission of evidence is not required to characterize 'a full hearing' where such evidence is immaterial to the issue to be decided. . . . Where no genuine or material issue of fact is presented the court or administrative body may pass upon the issues of law after according the parties the right of argument." *Producers Livestock Marketing Ass'n* v. *United States,* 241 F.2d 192, 196 (10th Cir. 1957); *affirmed* in 356 U.S. 282 (1958); 1 Davis, Administrative Law

Treatise 407–437 (1958). Besides, in the present case the Board informed the parties of the reasons on which it based its legal interpretation and thereafter left pending its decision and granted new hearings on the matter before rendering its final decision.

## III

 The items specifically refused by the Board in this case are, as previously stated, those of stacking up and loading the sugar bags in trucks in the leased warehouses, the rent of the warehouses and, partly, the transportation from the factory to the docks, from the factory to the leased warehouses, and from the latter to the docks. Besides, the Board ordered a 50% reduction on the item of land and hurricane insurance. Petitioners repeatedly state in their brief, and they likewise stated it before the Board, that the administrative disapproval of these expenses plainly raises a question of law. As we have already pointed out, this question refers first, to the scope of the powers of the Board as defined by § 8 of the Sugar Act, a matter which we have already considered; and secondly, to the reasons which the Board had to refuse said items, in other words, to the administrative interpretation of the term "shipment and marketing expenses."

In the Board's decision of April 7, after quoting a dictionary definition of the term "shipment," [6] the Board made the following statement:

"We believe, therefore, that all the expenses incurred by the central from the moment the continuous movement of the bags of sugar starts from the warehouses of the central to their final destination, are deductible pursuant to the provisions of said section within the 'reasonableness' test that we are allowed to use under the afore-mentioned section, and that every operation previous to the breaking of the stack of bags to be loaded on the

---

[6] "Action of loading supplies or merchandise on a ship or train for the transportation thereof." *Diccionario de la Lengua Española* (17th ed., 1947).

trucks or train starting the uninterrupted movement of said bags to their final destination, are operations of production and may not be included within the term 'shipment'."

And it added thereafter: "Therefore, we decide that the dividing line between what is production or elaboration process and what is shipment should be drawn between the storage and the breaking of stacks which starts the uninterrupted and continuous movement of the sugar bags to their final destination." This interpretation of the term "shipment and marketing expenses" was explicitly based by the Board on its own experience and knowledge "of the way and manner in which the sugar industry operates in Puerto Rico," [7] and quoted, also, other provisions of the Act and the legislative precedents to support its view.

The Board refused the item of rental of warehouses for the following reasons:

"Section 7 of the Sugar Act in force further provides 'that the *colonos* who choose that their share of the proceeds of their cane be liquidated in sugar, shall enjoy the right of storage in the warehouses of the central until the 31st day of December following the grinding season during which said sugar was produced, without payment of any amount whatsoever for the enjoyment of said right.'

"Such a provision clearly indicates the intention of the Legislature that the free storage until the aforesaid date should be another of the benefits granted to the colono as part of his global share in the proceeds of sugar.

"When the colonos' share is liquidated in sugar, their share of the proceeds of their cane, the central is bound to deliver to the colonos, pursuant to § 7 of the Sugar Act, the total amount of sugar pertaining to them without any deduction whatsoever for storage of said sugar, until the 31st of December following the grinding season during which said sugar was produced, or for any incidental expenses to the storage of said sugar. In this case the central is not authorized to deduct the shipment

---

[7] Section 10 of the Act provides that "The members of the Board must be persons of recognized capacity and experience in the sugar industry." 5 L.P.R.A. § 379.

and marketing expenses because the colono in selling his sugar in the market pays this kind of expenses incurred out of its own money. We do not see any provision whatsoever in the Sugar Act where when the colonos' share is liquidated in money and the central is bound to sell on its own the colonos' share in the proceeds of his sugar, the storage expenses and the incidental expenses upon the storage which the latter incurs are deducted.

"A mere comparison of the procedure established in the Sugar Act for the liquidation of the colonos' sugar, whether their cane be liquidated in sugar or in money, shows that neither the text nor the spirit of said Act considers the storage expenses and those expenses incidental thereto, as shipment and marketing expenses when the storage takes place before the final movement of the sugar to its destination or final delivery is initiated.

"It has been argued before this Board that the question of free storage for the colonos' sugar when the colono chooses to make his liquidation only in sugar refers to those centrals which possess warehouses of their own. But we understand that the phrase 'in the warehouses of the central' contained in § 7 of the Sugar Act, does not imply that the property title will be required in the warehouse on the part of the central and we understand the same and apply it within a reasonable interpretation that what the phrase means in itself is that these warehouses should be in the possession and control of the central.

"To interpret this section in the manner argued by the central would raise a serious question of due process of law as to the discriminating treatment between a central which does not charge for the storage of sugar and another which charges therefor, which could violate the constitutional guarantee of the right to equal protection of the laws.

"In view of the foregoing, we believe that a reasonable interpretation of the term 'shipment and marketing expenses' contained in § 8 can not include storage expenses or expenses of leased warehouses when the storage is made and frequently for a long period before the commencement of the continuous and uninterrupted movement of the bags of sugar in the shipment to its final destination."

The Board did not make any specific pronouncement as to the other items, finding support implicitly in the general pattern which it had outlined.

Petitioners allege that the Board's order is erroneous for the following reasons: 1. At least since 1943 Central Monserrate has leased warehouses and has charged those rents to the shipment and marketing expenses, without any objection whatsoever from the colonos or the official bodies; 2. In the year 1953 there was a Price Determination (S.D. 877.5) for the sugar industry, issued by the Secretary of Agriculture of the United States, which expressly authorized the centrals to deduct the rents on warehouses; 3. The central leases those warehouses for the purpose of selling the sugar when the marketing conditions are favorable, and thus protect its interests and those of the colonos; 4. The legal provision which orders free storage for the colonos refers solely to those which accept payment in sugar and does not cover, therefore, those who accept the payment in money, as it occurs in the present case. It may be noted that petitioners exclusively discuss the item of rents of warehouses.

It is true that the uncontroverted evidence presented by Central Monserrate showed that the latter included since 1943, without objection, the rents of warehouses in the shipment and marketing expenses. It also showed that other centrals did the same. Even assuming that this constitutes evidence of an industrial policy, which as we shall see is not entirely correct, it does not bind the Board. The continuous intervention of the state in the economic process is due precisely to the need of reforming the existing policies; it is done in order to establish new fluctuations between conflicting interests and in order to protect the weaker and more unsettled groups politically and economically. To order that the existing policies constitute decrees for the new regulation, would be to create the ideal framework for the application of the cynical French proverb "the more things change, the more equal they remain." This is not the Board's function nor ours.

It is equally correct that the Secretary of Agriculture of the United States through the Price Determination (S.D. 877.5) allowed the centrals to deduct the expenses of outside storage. It should be borne in mind, however, that this is not a clash between the federal and state power in a field where because of constitutional mandates the former must prevail. Such a conflict does not exist and petitioners offer the secretarial Determination only for its persuasive force, as the action of an officer responsible of dealing with these problems in another sphere of the government.[8] However, the argument loses its value almost completely when we consider, first, that our Sugar Act of 1951 contains several provisions [9] which do not conform to the above-mentioned secretarial Determination and which are more favorable to the colonos, this being a sign that our Legislative Assembly, for reasons which it considered sufficient, decided to offer a greater protection to the colonos than that which they had received from the federal authorities, and a sign, of course, that the Board may also depart from that Determination; and secondly, that as pointed out by the Board in its competent brief, on January 18, 1956 the Secretary made a new Determination (21 F.R. 333, 334–335) in which he explained that: "The provision under which processors permitted to charge producers for expenses incurred as a result of utilizing outside storage facilities has been eliminated because it is considered to be inequitable as among processors. The provision was made a part of the Determination during the war years when shipment services were disrupted, *but prior thereto the processor was required to store raw sugar free of charge to the producer. The action taken in this Determination restores the original relation-*

---

[8] The argument is not applicable to the item of stacking and loading bags in trucks, since the very evidence of petitioners shows that the Secretary did not allow said item.

[9] Thus, for example, the colonos' share in the sugar has a maximum of 67.5 in the secretarial Determination and one of 68.0 in the Sugar Act. The Determination does not mention the hauling and delivery expenses which the central should pay to the colono, while the Act does.

*ship.*" (Italics ours.) The above-mentioned inequities refer, undoubtedly, to the fact that the centrals owning warehouses within their premises were never allowed to deduct to the colonos the expenses of storing sugar, while during several years and for the above-mentioned reasons, the Secretary allowed said deduction to the centrals who rented warehouses. The 1956 Determination clarifies what the real industrial policy had been.[10] The fact that the central leased the warehouses in order to allegedly take advantage of the fluctuation in the market, does not alter the above-mentioned considerations.

 Nor is it of much importance that the provision of the Act regarding free storage only mentions "the colonos who choose that their share of the proceeds of their cane be liquidated in sugar." The powers of the Board to pass judgment on the shipment and marketing expenses pursuant to the provisions of § 8 are not affected by this specific mention. The Act grants equal compensation for their sugar and molasses to those colonos who accept payment in sugar as well as to those who accept it in money and establishes identical procedure to make computation. Sections 4 and 5. Neither the clear economic realities of the industry, already described, nor the powers of the Board may be defeated through the mechanical application of a rule of construction, as petitioners suggest. It is, in our opinion, a mere addition by way of emphasis. *Cf. Banco de Ponce* v. *Sec. of the Treasury*, 81 P.R.R. 432, 439 (1959) ; *Dávila* v. *General Supervisor of Elections*, 82 P.R.R. 257 (1961).

We have also examined the dissenting opinion delivered by one of the members of the Board and there is nothing in it to

---

[10] The above-mentioned Act of 1938 provided in its § 11 that "the central may deduct an amount which shall not exceed twenty-five cents (25) for each hundredweight, free from all imposts, to cover the expenses of bagging, freight, maritime insurance, commissions, insular excises, and all other expenses in connection with the sale of sugar in the New York market...." To us it seems that this legislative enumeration clarifies also what the industrial policy had been.

make us change our opinion. It contains the same arguments already considered.

Summarizing, we consider that the general conclusion established by the Sugar Board as to "shipment and marketing expenses," as well as the specific application of that conclusion made in the present case,[11] are entirely reasonable and in agreement with the purposes of the Act and the economic circumstances and of industrial organization to be governed thereby. Those views are entitled to "great weight and respect," as in the past. *Colonos de Caña de Santa Juana, Inc.* v. *Sugar Board*, 77 P.R.R. 372, 375 (1954) and judgments cited therein. None of the objections submitted by the petitioners, nor all of them taken as a whole, are sufficient to set aside said views. *Cf. South Porto Rico Sugar Co.* v. *Sugar Board*, 82 P.R.R. 456 (1961).

The decision of the Sugar Board imposing on petitioners the payment of costs and expenses pursuant to § 33 (5 L.P.R.A. § 402) is affirmed.

Mr. Justice Dávila did not participate herein.

---

[11] The reduction of the insurance item was the result of a study made by the actuary which, as we have pointed out before, was submitted to petitioners and was also, an object of the parole evidence. Petitioners do not submit any specific objection whatsoever against this study.